WARNER, J.
In prosecuting the appellant for battery on a law enforcement officer and trespass, the state attorney highlighted the appellant’s alleged use of racial slurs against the law enforcement officer in opening statements, during witness testimony, and in closing argument. Although defense counsel had moved in limine to deter the state’s use of the racial slurs, the court denied the motion. The use of derogatory terms did not tend to prove any element of the offenses charged and became so pervasive that we conclude that the court erred in denying the motion in limine. The state cannot show that the error was harmless. Indeed, the state’s strategy cannot be condoned by this court. As a result, we reverse the conviction of appellant and remand for a new trial.
Appellant was charged by information with one count of battery on a law enforce *813 ment officer and one count of trespass after being warned to depart the premises after an incident occurring at a Fort Laud-erdale nightclub. Prior to trial, appellant filed a motion in limine to exclude testimony from various witnesses that appellant used racial epithets during the altercation leading to her arrest. Appellant argued that “the actual slur itself is unduly prejudicial to the Defendant and will not tend to prove or disprove any element of the charges ... and will be confusing and distracting for the jury.” The state opposed the motion, arguing that appellant’s use of the racial slurs was relevant to prove the elements of the crimes. The court denied the motion.
Armed with this ruling from the trial court, the prosecutor commenced her opening statement with several references to the racial slurs. Her first statement to the jury mentioned them:
Today we start our case, and this is the testimony that you are going to hear throughout this case.
You f-g house n-r. F- you. Get your hands off of me you dirty n-r.
Throughout her opening she made several other mentions of the racial slurs which various witnesses testified they heard. In response, in his opening, appellant’s counsel stated that there were witnesses who never heard appellant use such statements.
The testimony perpetuated the theme of racial slurs. According to the bartender, appellant was drinking at the bar of the club. She had become “rowdy.” Although the bar closes at 4 a.m., the bartender stopped serving appellant around 3:15 a.m., because she was drunk' or out of money. When the bartender asked her to leave at 4 a.m., she asked for another drink, which the bartender refused to serve. She then threw a glass at him.
The security guard saw the incident, and asked appellant to leave. In addition, the bar manager and a duty officer, a Fort Lauderdale policeman, came over to help. The duty officer, an African-American, tried to escort appellant out of the building. The bartender testified that he heard appellant say to the duty officer, “all you filthy n-rs are the same.” The bartender then observed that appellant pushed or punched the officer, and then the officer hit or slapped her.
The duty officer also testified as to his efforts to remove appellant from the bar. He attempted to take her drink away, and when he did, she pushed him and spilled the drink. “She started cursing, n-r this, n-r that....” The officer gave her a trespass warning and asked her to leave. He grabbed her arm and started to walk her out of the bar, while she continued to call him “all types of names.” The prosecutor then asked the officer what types of names she was using. He explained that she said, ‘You f-g, excuse me [sic] French, house n-r. Get the f— off me. Then she went from house n-r to field n-r, and she was just cursing up a storm. She was using a lot of derogatory terms.” Despite the derogatory terms, the officer stated that he was doing his job in trying to remove her.
At one point while the officer was leading her out, appellant turned around and hit him in the chest with her right hand, closed fist. He “gave her the distraction blow with [his] left hand”; the blow was to the right side of her face. After the officer hit appellant, he stopped her and arrested her, placing her in handcuffs while she was still inside the bar. He placed her in his patrol car. On the way to the police station, appellant was “yelling, screaming, cursing at me, calling me the N word.”
The bar manager also testified to the altercation and appellant’s unwillingness to *814 leave the bar. When asked by the prosecutor, he also testified that the appellant used racial slurs against the duty officer. The manager stated that the duty officer asked her to leave, and when she refused, she was trespassing.
As part of her defense, an on-call security officer for the club, who was also an African-American, testified. He was present on the early morning of the incident. He knew appellant and had spoken to her at the bar. Just before closing time, he went to the restroom. When he returned, he noticed the duty officer interacting with appellant. The situation “escalated really fast,” and the duty officer “grabbed her by the arm, kind of forced her arm kind of behind her back, and he was like trying to force her out, pushing her towards the door.” He was “screaming that he was going to break her f-g arm,” and was “really over the top aggressive.” The on-call security officer did not hear appellant use racial slurs at any point, although she was using swear words. The on-call security officer walked up behind the duty officer and told him to calm down, “and at that point he started to release the arm and to allow me to escort her out.”
The on-call security officer also testified that appellant was a “friend of the bar,” meaning that she was given the privilege of staying at the bar after closing. In fact, the night before, appellant had stayed later with the manager of the bar and the club owner.
Appellant testified and claimed that she had been allowed to stay after closing as a “friend of the bar.” That night she was drinking with the on-call officer at bar closing, when she was tapped on the shoulder by the duty officer, demanding that she leave. Appellant looked for the bar manager for help, and the officer “immediately thought I was trying to defy his authority and became upset,” and grabbed her arm. She told him to get his hands off of her, but denied using a racial slur. The officer then said, “I’m going to break your f-g arm.” When she was being taken outside, she admitted using swear words at the officer, but not a racial slur. The officer then smacked her across the face. She continued to utter derogatory terms, but not racial terms, at the officer while being transported to the police station.
During closing arguments, the prosecutor made several references to the racial epithets used throughout the trial, concentrating on the words that appellant used and discussing their meaning. She related them to show the anger that appellant had toward the duty officer for demanding that she leave the bar.
The jury found appellant not guilty of battery on a law enforcement officer or any lesser offense and guilty as charged of trespass in a structure. Appellant was sentenced to five days in jail.
In this appeal, appellant contends that the court erred in denying her motion in limine to limit the use of racial slurs at trial as they were irrelevant, or if relevant, they were inflammatory and unduly prejudicial. “The standard of review for admissibility of evidence is abuse of discretion.” Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001). “However, a trial court’s discretion is limited by the rules of evidence.” Id.
Was the use of racial slurs relevant to the issues in this case? “Relevant evidence is that which tends ‘to prove or disprove a material fact.’ ” Johnson v. State, 991 So.2d 962, 966 (Fla. 4th DCA 2008) (quoting § 90.401, Fla. Stat. (2007)). “In determining relevance, we look to the elements of the crime charged and whether the evidence tends to prove or disprove a material fact.” Id.
*815 Regarding racial epithets, in Rich v. State, 18 So.3d 1227 (Fla. 4th DCA 2009), cited by both parties, this Court addressed the trial court’s evidentiary ruling on relevance in allowing testimony and argument regarding the defendant’s use of the term “cracker” while he was engaged in the sale of cocaine. Id. at 1228-29. This Court explained:
The fact that race may have motivated the defendant to sell cocaine to a black person instead of a white person, as the state argued in closing, had no bearing on the fact that the defendant was selling cocaine. This case is unlike those cases in which a defendant’s use of a racial slur was relevant to show the defendant’s state of mind as an element of the crime charged. See, e.g., Clinton v. State, 970 So.2d 412, 414 (Fla. 4th DCA 2007) (evidence that defendant, after stabbing victim, screamed “I’m going to kill you nigger” was properly admitted to prove defendant acted with premeditated design to cause the victim’s death).
Id. at 1229-30 (emphasis in original). “Ordinarily, racial slurs and ethnic epithets are so prejudicial as to render them inadmissible, unless the probative value outweighs any prejudice that may result from having the jury hear them.” MCI Exp., Inc. v. Ford Motor Co., 832 So.2d 795, 800 (Fla. 3d DCA 2002). “[Ijmproper remarks to the jury may in some instances be so prejudicial that neither rebuke nor retraction will destroy their influence, and a new trial should be granted despite the absence of an objection below or even in the presence of a rebuke by the trial judge.” Robinson v. State, 520 So.2d 1, 7 (Fla.1988) (citations omitted).
Throughout the motion jn limine hearing in this case, the prosecutor contended that all of the racial slurs by appellant were evidence of appellant’s state of mind at the time of the incident. As mentioned above, however, the use of the racial slur should be relevant to appellant’s state of mind as an element of the crime charged. See Wimberly v. State, 41 So.3d 298, 303 (Fla. 4th DCA 2010) (citing Rich). In contrast to the statements made in Wimberly, the statements made by the appellant here have little bearing on an element of battery on a law enforcement officer or any element of trespass. The vast majority of the racial slurs uttered by appellant as testified to by the witnesses had nothing to do with proving an intent to strike the duty officer, a necessary element of battery on a law enforcement officer. Thus, we conclude that most of the slurs were not relevant evidence. Moreover, even if some were relevant, we have no trouble in concluding that the prosecutor’s excessive use of the slurs crossed the line such that their prejudicial- effect outweighed their probative value.
“ ‘[Introduction into evidence of a racial or ethnic-slur is not per se reversible error.’ ” Wimberly, 41 So.3d at 303 (quoting Rich, 18 So.3d at 1230). Nevertheless, the state has the burden of proving that the error was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); Rich, 18 So.3d at 1230-31. In Wimberly, for instance, this court affirmed an evidentiary decision when the defendant was charged with attempted first degree murder, “which required the state to prove that the shooting was committed with premeditation” — in such an instance, “the use of the racial slur was relevant to the shooter’s state of mind as an element of the crime charged.” 41 So.3d at 303. In Rich, we found that the introduction of the racial slur was also harmless where the defendant’s use of the racial slur would have been “meaningless” to the jury which also heard from five *816 different officers about the witnessed drug transaction. 18 So.3d at 1280-81.
In this case, the use of racial epithets by the appellant became a feature of the prosecutor’s case from the very first statements she made to the jury to the end of closing argument. We count that the prosecutor herself used the slur twenty-three times during the trial, not counting all the times witnesses testified to various references. In Rich, we found that the racial slur was harmless, because the state was not “attempting to inject race as an issue in the trial or impermissibly appealing to bias and prejudice.” 18 So.3d at 1231; see also Jones v. State, 748 So.2d 1012, 1023 (Fla.1999). Here, it is apparent from the prosecutor’s entire trial strategy that the state was purposely injecting racial prejudice into the case.
It is true that the jury acquitted the appellant of battery on a law enforcement officer, the charge to which the state claimed the slurs might relate regarding the element of intent. However, the state cannot prove that this extensive focus on the slurs did not also affect her conviction for trespass. In order to find a trespass, the state must prove that the defendant refused to leave the preinises after being instructed to do so by an authorized person. See § 810.08(1), Fla. Stat. The racial references could have improperly influenced the jury on this issue, as the duty officer even testified that he forced her to leave after giving her a trespass warning without waiting for her to respond or allowing her to leave of her own volition. Appellant testified that she was a “friend of the bar” and had been allowed to stay. She was not refusing to leave but was being forced out of the bar by the duty officer. Because the issue was close, the state cannot prove beyond a reasonable doubt that the inflammatory references and prosecutorial argument centered on the racial slurs did not affect the jury.
Finally, we reiterate the comments we made in Rich that the prosecutor has a duty to do justice without appealing to inflammatory and prejudicial statements:
For future situations where a relevant statement includes an irrelevant racial slur, we remind attorneys and trial courts to consider redacting the racial slur. As the supreme court stated in Jones:
[W]e strongly caution prosecutors against eliciting testimony involving racial slurs unless absolutely necessary .... In circumstances such as this, we strongly suggest that prosecutors err on the side of caution by omitting these statements and that trial courts consider the danger that the prejudicial effect of such evidence will substantially outweigh any probative value. See § 90.403, Fla. Stat. (1995).
[748 So.2d at 1023] .... Moreover, redacting the express statement of the racial slur, as the defendant requested, may have prevented the defendant’s concern that his statement would affect the verdict.
Rich, 18 So.3d at 1231. The prosecutor in this case did not abide by these admonitions.
We reverse appellant’s conviction for trespass and remand for a new trial in which the racial slurs are not used.
CIKLIN, J„ and BLANC, PETER, Associate Judge, concur.